

**Signed April 08, 2011.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**
_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-30110-hcm |
| | § | |
| ALLEN C. BORSCHOW AND PATRICIA | § | |
| L. BORSCHOW | § | CHAPTER 7 |
|     Debtors. | § | |

| | | |
|---|---|---|
| TURBO ALEAE INVESTMENTS, INC. | § | |
|     Plaintiff, | § | |
| | § | ADV. NO. 09-03005- hcm |
| v. | § | |
| | § | |
| ALLEN C. BORSCHOW AND PATRICIA | § | |
| L. BORSCHOW | § | |
|     Defendants | § | |

### <u>MEMORANDUM OPINION</u>

This case illustrates what can happen when a friend loans money to another friend, and then the relationship turns sour when the friend cannot repay the loan. Here, Turbo Aleae Investments, Inc., Plaintiff, filed a Complaint Seeking Determination of Non-Dischargeability of Debts ("Complaint") against Allen C. Borschow and Patricia L. Borschow, Defendants and Debtors.  In general, the Complaint alleges that a loan owed by the Borschows is non-dischargeable in the Borschows' bankruptcy case under

1

11 U.S.C. §523(a)(2)(A).

On December 3, 2010, the Court conducted a trial in this adversary proceeding. In reaching its decision, the Court has considered the proffers of direct testimony, the demeanor and credibility of all witnesses at trial, all admitted exhibits, and the record in this case. The Court has also considered the oral arguments and statements of counsel, the pleadings and briefs filed by the parties, as well as its own legal research. The Court concludes for the reasons set forth herein, that the debt at issue is dischargeable in part and non-dischargeable in part.

The Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§157 and 1334, and this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I) and (O). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

## I.   **PROCEDURAL BACKGROUND**

Turbo Aleae Investments, Inc. ("Turbo") filed this adversary proceeding seeking a determination that Allen C. Borschow ("Allen") and Patricia L. Borschow ("Patricia") (collectively the "Borschows") fraudulently secured a loan from Turbo and therefore the debt is non-dischargeable under §523(a)(2)(A). The Borschows answered the Complaint and denied that they fraudulently induced Turbo into making the loan, but admitted that they were not able to pay the debt.

Turbo then moved for Summary Judgment seeking a determination that any claims the Borschows have against a third-party, Eureka Media Group ("Eureka"), were irrelevant and could not provide a defense to non-dischargeability. Turbo argued that the Borschows did not raise any affirmative defenses or counterclaims and merely asserted in discovery that it had claims against Eureka and that the claims provide a defense to the lawsuit. The Borschows responded, Turbo replied, and the Court denied the Motion for Summary Judgment because Turbo sought summary judgment with respect to defenses that had not been pled. On October 5, 2010, Turbo filed a Motion in Limine seeking to keep out the allegedly irrelevant claims against Eureka. The Court

denied the Motion in Limine after a hearing on November 2, 2010.[1]  Prior to trial, at the Court's request, the parties filed proffers of their witnesses' direct testimony.

In its Complaint, Turbo alleges in general that the Borschows fraudulently obtained a $150,000 loan, as reflected in a promissory note signed January 29, 2007, by representing: (1) that they would use part of the money loaned to pay State National Bank; (2) that equipment owned by the Borschows' company (Borschow Industries, Inc.) would be free and clear of any security interest held by State National Bank; (3) that they would use part of the loan to make at $30,000 payment to Eureka Media Group, Inc.; (4) that they would obtain a life insurance policy on Allen Borschow in favor of Turbo; (5) that they would repay the loan; and (6) by making other false and fraudulent misrepresentations to Turbo.  At trial and in its Pre-trial Order, Turbo additionally asserted that the Borschows misrepresented that they would grant Turbo a mortgage on their home and that they were using the money to cover overdrafts in Borschow Industries, Inc.'s corporate bank account.  Turbo seeks actual damages, exemplary damages, its attorneys' fees and expenses incurred in prosecuting this adversary proceeding, interest, costs of court, and a determination that the obligations of the Borschows are non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

In general, the Borschows argue that the debt is dischargeable because (1) they did not make the alleged misrepresentations, the alleged misrepresentations did not cause Turbo any damage, and Turbo could not justifiably rely on the alleged misrepresentations;  (2) the "bulk" of the money was loaned by Omar Koury, individually; the recipient of the alleged misrepresentations was Omar Koury, individually; and that Omar Koury, individually, is not a Plaintiff in this proceeding; (3) there could be no reliance on anything said or done by Patricia Borschow because all of the money was loaned by the time she promised to be answerable for the loan and signed a note to Turbo; and (4) the showing of "justifiable reliance" must be stronger in this case because Turbo had intimate knowledge of the Borschows' adverse financial circumstances and because Eureka's services failed to improve their bad financial

---

[1] The testimony and evidence regarding alleged claims against Eureka do not impact the Court's decision in this case.

situation, and Turbo failed to meet this stronger justifiable reliance standard. [2]

At trial, the following parties appeared and testified: Omar Koury ("Omar"), Ernest Koury ("Ernest") (collectively the "Kourys"), Allen Borschow ("Allen"), Patricia Borschow ("Patricia"), Cliff Eisenberg ("Eisenberg") and Pedro Galicia ("Galicia").

## II.  TESTIMONY & EVIDENCE

### A.  General Background

In 1994, the Borschows formed a company called Borschow Industries, Inc. ("BI").  BI acquired Almost Originals, which specialized in transferring prints of artwork onto canvas.  Initially, BI generated most of its business at gift show fairs organized by Ed Lynch doing business as SUNGLO.  In 2004, BI's business began to decline.  Soon thereafter, Almost Originals and Mr. Lynch agreed to terminate their relationship and agreed that Almost Originals (BI) would do its own marketing.  On September 3, 2004, BI obtained a Small Business Administration ("SBA") loan through State National Bank ("SNB") in the amount of $90,000, secured by all of BI's inventory, accounts receivable, and equipment (Pl. Ex. 3).  On September 8, 2004, BI executed a promissory note with SNB in the principal amount of $75,000 that was also secured by all of BI's inventory, accounts receivable, and equipment (Pl. Ex. 2).

Allen became friends with Ernest and Omar Koury, the directors of Turbo, after they met at El Paso Country Club in 2005.  In March 2006, Allen, through Almost Originals, entered into an agreement with Eureka, a high-tech marketing and promotions business that is owned and operated by Ernest Koury.  BI and Eureka agreed that Eureka would create a catalogue of prints for BI and update BI's website. After signing the agreement, the Borschows expressed dissatisfaction with Eureka's

---

[2] In response to Plaintiff's Motion for Summary Judgment, the Borschows also raised usury as a defense, arguing that requiring the Borschows to promise to pay Eureka's account with BI in order to get the new terms to retire the January 2007 note constituted usury.  However, this defense was not raised in Defendants' Answer to the Complaint or in the Defendants' Pre-trial Order; thus the Court finds that the Defendants waived their right to assert a defense based on usury.  *See Cadles Grassy Meadows II, L.L.C. v. Gervin (In re Gervin),* 300 Fed. Appx. 293 (5th Cir. 2008) citing *Harris v. Sec'y, U.S. Dept. of Veterans Affairs*, 126 F.3d 339, 343 (D.C. Cir. 1997) ("[A] party's failure to plead an affirmative defense . . . generally results in waiver of that defense and its *exclusion from* the case."); *Najarro v. SASI Intern., Ltd.*, 904 F.2d 1002 (5th Cir. 1990) (recognizing the affirmative defense of usury).

work because the catalogue was not completed in a timely fashion and the website was not sufficiently populated with prints.  BI's sales continued to decline.

According to Allen, the loan discussions with the Kourys began in late August or early September 2006 after Allen announced at a weekly poker game that he could no longer afford his country club golf membership.  Allen testified that after the announcement, the Kourys approached him and asked if they could do anything to help, at which point Allen asked if they could loan him some money.  A few days later Allen and the Kourys met at Jaxsons Restaurant and Brewing Company ("Jaxsons") to discuss BI's need for financial support and a potential loan to BI and/or the Borschows (the "Jaxsons Meeting").

Predictably, the testimony regarding what occurred at the Jaxsons Meeting differs.  In his proffer, Allen testified that he explained to the Kourys at the Jaxsons Meeting that BI's sales had fallen off and not rebounded.  Allen also stated that he discussed with the Kourys that with fourth quarter sales upcoming, BI should be able to pay back some money, but that they left open how much money he needed to borrow.  In his proffer of testimony, Omar stated that at the Jaxsons Meeting, Allen made the following representations: (1) that he had overdrawn his bank accounts at SNB and was being charged overdraft fees; (2) that he needed cash to bring his bank accounts current; (3) that eliminating the overdraft fees would improve his cash flow and cover his debt payments; and (4) that he had a loan with SNB and that SNB had a lien on BI's equipment.  The testimony of all parties seem to be consistent in two aspects—at the Jaxsons Meeting the Kourys suggested that Allen talk to their banker at JPMorgan Chase Bank ("Chase Bank") about obtaining a loan, and that Patricia did not attend the Jaxsons Meeting.

After the Jaxsons Meeting, Omar issued several checks payable to Allen.  The first check, dated September 30, 2006, Omar wrote in the amount of $10,000 (the "September 30th Check") (Pl. Ex. 5).  On November 3, 2006, Turbo, acting through Omar, loaned another $80,000 to Allen (the "November 3rd Check") (Pl. Ex. 7).  Also on November 3, 2006, Allen signed a promissory note in favor of Turbo for $90,000, representing the September 30th Check from Omar and the $80,000 loan from Turbo (the "November 3rd Note") (Pl. Ex. 11).

In addition to the Turbo loan, Omar testified that the Borschows or BI applied for a $50,000 working capital loan from a third party lender recommended by Pedro Galicia. According to Omar's proffer, Allen then asked if Turbo could lend him enough money to provide BI with working capital, pay off the SNB loan, and pay Eureka because the loan application process with the third party lender would take too long.

On December 1, 2006, Omar wrote Allen another check for $10,000 and indicated on the check that the money was a "personal loan" (the "December 1st Check") (Pl. Ex. 8).  At trial, Omar said that he believed that the $10,000 check dated December 1, 2006, was written while Allen was trying to obtain the $50,000 working capital loan.  On December 8, 2006, Omar wrote Allen a check for approximately $27,608 (the "December 8th Check").  This check was also labeled "personal loan" (Pl. Ex. 9).  At trial, Omar testified that the December 8th check represented the $50,000 working capital loan minus the amount the Borschows owed to Eureka for its services to BI ($21,391).  On January 18, 2007, Omar wrote Allen a check in the amount of approximately $21,391, also labeled "personal loan" (the "January 18th Check") (Pl. Ex. 10).

Sometime between the Jaxsons Meeting and January 2008, Allen contacted Pedro Galicia about obtaining a loan through Chase Bank.  Ultimately, Chase Bank did not grant Allen, the Borschows, or BI a loan.  Instead, on January 25, 2007 Turbo obtained a $150,000 loan from Chase Bank with an interest rate of 7.25% and on January 29, 2007, Allen signed a second promissory note in favor of Turbo in the amount of $150,000 with an interest rate of 10.25% (the "January 29th Note") (Pl. Ex. 12).  It was not disputed that the loans made by Omar personally were assigned to Turbo and rolled into the January 29th Note.  Upon questioning at trial, Omar stated that the $150,000 amount reflected in the January 29th Note evidenced the following loans for the following purposes: (1) $80,000 to pay off the SNB loan; (2) approximately $47,000 to replenish working capital and bring the SNB bank accounts positive; and (3) approximately $21,000 to pay the Eureka debt.[3]  Omar stated that Allen represented that $150,000 would be enough money to provide BI with sufficient working capital, pay

---

[3] On re-direct examination at trial, Omar clarified that the amount of the checks only adds up to $149,000 and that the $150,000 number in the promissory note reflects the addition of $1,000 in accrued interest.

off the SNB loan, pay Eureka, and have enough cash flow to pay its debt to Turbo.

According to Allen, throughout the loan funding process, the Kourys never asked him for a financial statement, a profit and loss statement, or a balance sheet, and he made it clear to the Kourys that his business and personal financial condition was bad. Allen also testified that his wife Patricia did not sign the November 3, 2006 or January 29, 2007 notes and that she was not present when he discussed borrowing money with either of the Kourys. Patricia testified that she never requested a loan from the Kourys or Turbo and did not make any representations about the use of the loan proceeds. Patricia testified that her only contact with the Kourys prior to September 2007 was at church and in her attempts to get Eureka to perform the services it was hired by BI to perform.

On September 18, 2007, both Patricia and Allen executed a letter agreement in favor of Turbo in the principal amount of $174,500.41 ("Letter Agreement"). In the Letter Agreement, the Borschows agreed to pay Turbo $7,000 on or before September 30, 2007 (Pl. Ex. 13). The Borschows also agreed to combine the approximately $153,775 balance from the January 29th Note with the approximately $20,725 balance due to Eureka into a single note payable to Turbo (Pl. Ex. 13). On September 28, 2007, Patricia and Allen executed a new promissory note in favor of Turbo in the amount of approximately $167,500 with an interest rate of 10.25% and agreed to make monthly payments to Turbo in the amount of $1,700 (the "September 28th Note") (Pl. Ex. 15). Allen agreed the September 28th Note reflected the sums loaned to him by Omar and Turbo and the Eureka debt. Allen also said that the Eureka debt (roughly $17,000 by Allen's calculation or $20,725 by Omar's calculation) was paid by Turbo. In his proffer, Allen said that he and Patricia signed the Letter Agreement and September 28th Note because Omar threatened to sue if they refused. In her proffer, Patricia admitted that she signed the Letter Agreement and September 28th Note, but stated that prior to that time she had not promised to pay anything to Turbo or Eureka. After signing the September 28th Note, the Borschows made seven payments to Turbo, but stopped making payments after March 2008 (Pl. Ex. 40).

According to Allen, BI went out of business in January of 2008. At trial, Allen admitted that the business only had two years of positive income and that their 2006

income statement reflects a loss of $124,000.  Allen was unable to say how they were supporting the losses.  When presented with a home refinance application dated November 8, 2007 signed by Allen and Patricia and reflecting salary of $8,200 a month, Allen admitted that the salary amount was incorrect.  On re-direct examination, Allen stated that the $8,200 in monthly income listed on the application was an average of income earned for several years (not necessarily that particular year), and that at the time they signed the refinance agreement they thought the company would rebound. Allen also testified that after BI closed its operations, SNB liquidated BI's equipment for less than $5,000.  At trial, an auctioneer's report indicating that the equipment was sold for $1,640 was entered into evidence [Pl. Ex. 53].

Approximately one year after BI went out of business, the Borschows filed bankruptcy under Chapter 7 on January 26, 2009.  Based on the principal amount and the interest rate in the September 28th Note, as of December 2009, the total amount of debt owed to Turbo was approximately $198,388 (Pl. Ex. 40).

## B.  General Representations

In his testimony, Omar said that during the loan process, the Borschows represented that they would use the Turbo loan proceeds to: (1) pay off BI's loan with SNB, which would release SNB's lien on BI's equipment; (2) pay Eureka in full; and (3) increase working capital by covering all of the overdrafts and bank charges in their business bank accounts.  When asked when the above representations were made, Omar stated "[t]he Borschows made these representations on multiple occasions in November and December of 2006 and January 2007.  The representations were made to me at Turbo's office and Jaxsons, among other places."  Omar also testified that the Borschows agreed to grant Turbo a security interest in BI's equipment after the SNB loan was paid off, agreed to grant Turbo a lien on their homestead, and that Allen agreed to obtain a life insurance policy naming Turbo as the beneficiary.

On re-direct at trial, Omar explained that if Allen had brought his account balances positive he would have eliminated the overdraft fees and that the amount of late fees and overdrafts was comparable to what Allen would pay to service the Turbo

loan.   Notably, Omar stated in his proffer that when he began loaning Allen money he expected to be paid back when Allen obtained a loan from Chase Bank.   Omar also testified that he believed the Borschows would successfully obtain a loan from Chase Bank because he was willing to act as a guarantor if the Borschows could not obtain the loan on their own.   When the loan was rejected, Omar stated that he decided it would be easier for Turbo to obtain the loan from Chase Bank and loan the money directly to the Borschows.   At trial, Omar testified that he first offered to co-sign the Chase Bank note at the Jaxsons Meeting.

Similarly, Ernest stated in his proffer that the Borschows told him they were going to use the money loaned by Turbo to do three things: (1) pay off BI's SBA  loan with SNB, which would then release SNB's lien on BI's equipment; (2) pay Eureka in full; and (3) increase working capital by covering all of the overdrafts and bank charges related thereto in their bank accounts.   Ernest said that by doing those three things, the Borschows' cash flow would improve since the payments due to Turbo were less than the combined total of the payments owed to SNB, the overdraft fees, and the payments owed to Eureka.   Ernest stated in his proffer that the Borschows made the above representations on multiple occasions in November and December of 2006 and January of 2007 and that the representations were made to him and Omar at Turbo's office, Jaxsons, and other places.

Then, when asked at trial if the use of the loan proceeds was discussed at the Jaxsons Meeting with Allen, Ernest first said he did not remember when the discussion took place.   However, when asked the same question by his counsel later in the trial, Ernest said that there was a conversation with Allen about how the loan proceeds were to be used at the Jaxsons Meeting.   Specifically, Ernest said that Omar suggested the Borschows pay off the SNB loan and stated that he would provide the funds to get the account positive to prevent more fees and improve cash flow.   According to Ernest, Allen agreed that the loan proceeds would be used for those purposes.

When asked how agreeing about how the loan proceeds would be used at the Jaxsons Meeting is consistent with the Kourys sending Allen to Chase Bank to obtain a loan, Ernest stated that he did not deal with the "financial stuff."  Opposing counsel then questioned why, if the Kourys and Allen agreed on the purposes of the Turbo/Omar loan

9

at the Jaxsons Meeting, the Kourys sent Allen to Chase Bank to get the loan. Ernest said again that Omar should answer that question. When asked why the Kourys and Allen discussed the purposes of the loan at the Jaxsons Meeting when the loan was to be between the Borschows and Chase Bank, Ernest said that before any monies were loaned they needed to have an understanding of the use of the funds.

Allen testified that he had no idea why the Kourys wanted him to obtain a loan from Chase Bank. Allen said Pedro Galicia, a Chase Bank officer, came to his office and toured the facility, but he could not remember if he ever discussed the amount of the loan with Chase Bank or if he ever filled out a loan application. At trial, a portion of Allen's deposition was read into the record. In his deposition, Allen stated that Chase Bank was going to loan them money with Omar's co-signature and when Chase Bank declined the loan, Omar loaned them the money himself. In his deposition, Allen stated that the purpose of the money from Chase Bank would have been to take care of the personal and business overdrafts in the SNB accounts and to keep the Borschows personally and BI going. On cross examination, Allen stated that he was unaware that Turbo was borrowing money from Chase Bank.

When called as a rebuttal witness at trial, Pedro Galicia testified that he had been the Kourys' bank officer at Chase Bank for 8 years. He said that his involvement with the Borschow began after the Kourys mentioned that they had a friend who wanted to refinance his debt with Chase Bank. Galicia stated that he did not remember the amount of the proposed loan to the Borschows, but remembered that the Borschows had two loans at SNB and that they were around $150,000. According to Galicia, the Borschows told him that they were having trouble paying the SNB loans and wanted a longer term. Galicia said he informed the Borschows that they would need to pay off the SNB loan if they wanted a longer term with Chase Bank. Galicia testified he met with the Borschows at their office three times and that the Borschows filled out a loan application at one of the later meetings. He said that Chase Bank did not approve the loan because the Borschows did not meet the financial requirements to be eligible for a loan. Galicia said that Chase Bank could not find the Borschows' loan application and stated that Chase Bank's documents retention policy is two years.

10

At trial, Omar admitted that he had never discussed BI's business with Patricia, but stated that she was at some of the meeting where they discussed the loan documents and that at those meetings Patricia did not tell him that the loan proceeds were not going to be used to pay off SNB.  Patricia testified that she was not at any of the meetings where Omar and Allen discussed the loans and stated that the Turbo loan never came up at her meetings with Eureka.

Approximately six month after the last of the money was loaned, Omar said that he discovered that Allen had not paid off the SNB loan.  Omar stated that he learned about the Borschows' financial state during a conversation with American Finance's owner, Cliff Eisenberg, regarding Omar's agreement to co-sign a $30,000 loan for Allen.[4]  At trial, Omar stated that Eisenberg warned him that co-signing the American Finance loan was risky.  In response, Omar said he told Eisenberg loaning Allen the $30,000 would allow Allen to repay the SNB loan and start paying Omar back.  In his proffer, Eisenberg stated the following about the events surrounding the $30,000 loan his company gave to Allen Borschow:

> As I recall, Mr. Borschow requested an unsecured $30,000 loan at a time when he already had a loan outstanding with my company.  Mr. Borschow told me he needed the money to invest in a new project he was embarking on in his business.  When his loan request was denied, he asked if the loan request would be granted if he was able to produce a strong guarantor, to which I replied in the affirmative.  He told me he thought Mr. Koury would guarantee his loan, but he needed to talk to him first.
>
> The next day Mr. Borschow told me the Mr. Koury was indeed willing to guarantee the proposed loan.  Being that Mr. Koury, as well as Mr. Borschow, was a personal friend of mine, I wanted to talk to Mr. Koury directly before agreeing to grant the loan.  I did speak to Mr. Koury and warned him that there was a high likelihood that he would end up paying the loan pursuant to his guarantee because it was my understanding that both Mr. Borschow and his business were in some financial trouble.  Mr. Koury told me that he had already lent Mr. Borschow quite a large sum of money and that while reluctant to offer his guarantee on the proposed loan, it was the only way he could see of getting his loans repaid so he agreed to guarantee the loan.

---

[4] According to Allen's testimony, he borrowed the $30,000 from American Finance in July of 2007 to enable BI to service a large-scale production contract and to keep the business from closing.

> Subsequently, Mr. Borschow defaulted on the loan and Mr. Koury, after demand, paid the principal balance of the loan to my company pursuant to his guarantee.

At trial, Omar admitted that when he co-signed the American Finance loan he had already learned that Allen had not used the Turbo loan proceeds to pay off the SNB loan, knew that the Borschows had missed several payments under the Turbo promissory note, knew that Allen had not secured a life insurance policy naming Turbo as beneficiary, and knew that Allen had not paid the Eureka debt.  Omar said that he agreed to co-sign the loan with American Finance because Allen was still a friend.  Upon questioning during re-direct at trial, Omar stated that he signed the guarantee because he had already told Allen that he would sign it.  Omar also testified that he paid the $30,000 to American Financial based on his guarantee of the loan and that he did not include that $30,000 in the damages requested in this adversary proceeding, because he knew about the Borschows' financial condition at the time he signed the guarantee.

According to Omar, after he found out that the Borschows had not paid off the SNB loan, he sent an email to Allen at canvas@aol.com on July 27, 2007 (the "July 27th Email").  The July 27th Email stated, in part:

> As you are aware, [the loan proceeds] were to be used for THREE primary reasons: to pay off your SBA debt; pay off your debt to demographics (in-full); and push your checking account balances to a positive amount.  It appears as though NONE of these have been done.  You told me, at the start, simply by doing this, the overdraft fees, in excess of $3,000 a month, you were paying at State National would cease and would create enough cashflow to make monthly payments to me.  I was extremely disappointed when you used the same excuse about the overdraft fees to justify a new loan from Cliff.  Needless to say, I feel you have not been entirely honest with me and have taken advantage of my willingness to help.  It is VERY important that you provide me with any information I request, in order to determine the risk level you have now put me in (Pl. Ex. 38).

In response, Allen emailed Omar the following description of how the loan proceeds were used:

> Here is the split and explanation of how we used the $150,000 that you loaned us.  We put $108,000 into the business and $42,000 into our personal account.  The following explains the business deposits.  On

August 25th, 2006 we deposited $10,000 into our business against a balance of -$18,419.04.  On November 6th, 2006, we deposited $40,000 into our business against a balance of -$49,055.18.  On December 1st, 2006 we deposited $9,000 into our business against a balance of -$26,003.39.  On December 11th, 2006 we deposited $27,608.46 into our business against a balance of -$20,999.54.  On January 18th, 2007 we deposited $21,391.54 into our business against a balance of -21,741.50.  On the personal side the money went into our personal checking account to get it back to even and approximately $25,000 went to clear some of our credit card debt (Pl. Ex. 38).

At trial, Omar pointed out that the Borschows did not refute that they agreed to use the money as stated in his July 27th Email in their response to such email.  At trial, Omar testified that the canvas@aol.com email address belonged to Patricia and that the July 27th Email was sent to her email address because Allen did not have an email address of his own.  On re-direct at trial, Omar was directed to a letter to Omar from Allen dated July 31, 2007 that requests a 15% discount on the debt owed to Eureka due to the Borschows' dissatisfaction with Eureka's performance [Def. Ex. aa].  Omar agreed with his counsel that Allen did not dispute Omar's characterization of how the loan proceeds were to be used in the July 31st letter.  Omar was then directed to another letter to Omar from Allen discussing the 15% discount dated September 7, 2007 and noted that the letter did not dispute Omar's characterization of how the loan proceeds were to be used [Def. Ex. bb].  On re-direct examination at trial, Omar also stated that the first time he learned that Allen disputed Omar's characterization was after the September 18, 2007 Letter Agreement was signed by the Borschows.  When asked if the July 27th Email or Letter Agreement advised Allen and Patricia that they had a duty to refute the allegations regarding the use of the loan proceeds, Omar said that his statement that the loan proceeds were not used as agreed would naturally require some response.

Upon questioning during cross-examination, Allen testified that he did not know why Omar had sent the July 27th Email, but that he imagined it was because Omar was frustrated over the situation with the loans.  When asked why he did not refute Omar's characterizations in the July 27th Email of how the loan proceeds were to be used, Allen said he did not think he needed to refute the characterizations.

After the email exchange on July 27th, Omar stated in his proffer that Allen came to Turbo's office to drop off the Borschows' bank statements.  Omar stated that he and Allen began arguing about the situation and that Ernest witnessed the argument.  Omar testified that during the argument he explained the entire history of the loans and that by the end of the discussion Allen agreed that he was supposed to pay off the SNB loan with the proceeds of the Turbo loan.  When asked if Allen said that part of the money was to be used for working capital at the meeting, Omar said:

> At the beginning of that meeting, Allen . . . disputed the fact that the money was to be used for the equipment loan and I was extremely frustrated at that time after learning all of this and so I went through and explained the entire circumstances of how we started, what occurred at Jaxsons, the funding process of the loan application with Chase Bank.  I went through the entire thing and by the end of the meeting Allen said, yes you're right and he even made a comment to Ernie, because of my frustration that he was concerned I was going to punch him because of how upset I was at the situation.

According to Ernest, at the meeting after the July 27th Email, Allen apologized that he did not use the funds appropriately.  On cross-examination, Allen admitted that he met with the Kourys after the July 27th Email and that the meeting got contentious.  However, Allen said that he did not apologize for not using the loan proceeds to pay off the SNB loans, he apologized for not paying the Eureka debt.

Omar stated that Turbo would not have loaned the money if it had known the Borschows would not use the money to reduce their debt and bank charges and that he had no reason to believe they would not use the money as represented because he was friends with Allen.  Ernest also testified that Turbo would not have made the loans to the Borschows without those representations.

Allen stated that he never represented to the Kourys that the loan proceeds would be used to pay off the SNB loans or that Turbo would get a lien on BI's equipment.  On cross-examination, Allen again stated that he did not believe that he had to pay off SNB with the loan proceeds and that he believed he could use them for working capital.  On re-direct examination, Allen testified that he told Omar that the loan proceeds would be used to pay household expenses and to bring their personal accounts positive.  Allen also stated that he never received enough money from the

14

Kourys and Turbo to pay off the SNB loan because it would have taken $115,000.  With the overdrafts and Eureka debt, Allen said he would have needed to borrow over $200,000 to pay off the SNB loans and bring his accounts positive.  Allen stated in his proffer that at all times before and when receiving the checks from Omar Koury, he fully intended to repay the loans.

### 1.  Additional SNB Representations

Both Omar and Ernest testified that, at the Jaxsons Meeting, Allen discussed the loan he had with SNB and that SNB had a lien on BI's equipment.  Omar said that Allen represented that he had only a $76,000 equipment loan at SNB.  In contrast, Allen testified that he explained to the Kourys that there were two business loans at SNB, a SBA loan and a line of credit loan and that together the loans amounted to over $115,000.  The Kourys and Allen appear to agree that Omar suggested to Allen that he obtain a loan from Chase Bank to pay off the SNB loan and to provide working capital to BI.

According to Omar's testimony, the November 3, 2006 promissory note between Allen and Turbo was signed when Allen was still meeting with Chase Bank about obtaining a loan; hence the promissory note was due on January 5, 2007, at which time the Borschows would have in theory obtained the loan from Chase Bank.  Omar testified that the $80,000 check from Turbo dated November 3, 2006 was intended to be used to pay off the SNB loan.  As noted above, Omar stated in his proffer that when he began loaning Allen money he expected to be paid back when Allen obtained a loan from Chase Bank.

According to Allen, a few days after the Jaxsons Meeting, he talked to the Chase Bank loan officer, Pedro Galicia, and was advised that Chase Bank could not accept or receive a transfer of a SBA loan from another bank.  Allen said he relayed that statement to Omar, and that Omar did not press for moving their banking to Chase Bank or for paying off the SNB loan from that point on.  Allen stated that at the time Pedro Galicia toured BI, they were no longer discussing paying off the SBA loan because it could not be moved.

According to Patricia's testimony, one purpose of the Chase Bank loan was to move the SNB loans to Chase Bank. However, she also said that she did not believe the loan from Turbo would have been enough to pay off the SNB loans.  When directed to her deposition, Patricia read into the record her statement that $150,000 would have been enough to pay off the SNB loans, but that it would not have been enough to have operating funds and to bring the checking accounts positive.

Upon questioning at trial, Omar testified that he was not relying on BI's survival to get the loan repaid.  Instead, Omar stated that he was relying on the payment of the SNB loan because then BI's equipment would be free and clear and Turbo could be repaid from selling the equipment.  Omar admitted that the promissory notes payable to Turbo do not provide Turbo with a security interest in BI's equipment, but stated that he believed once the SNB loan was paid off, Turbo would have the only lien on the equipment.  During cross-examination at trial, Omar admitted that he never looked at BI's equipment, did not know what pieces of equipment BI owned, and that he did not get a financing statement or a lien transfer.

## 2.  Additional Overdraft Representations

Ernest stated that, at the Jaxsons Meeting, Allen represented that he occasionally overdrew his bank accounts at SNB and that SNB was charging overdraft fees every time he overdrew his accounts.  According to Ernest, Allen also stated that if the overdraft fees were eliminated, he would be able to improve his cash flow and cover his debt payments.   On cross-examination at trial, Ernest testified that Allen did not disclose an overdraft limit at SNB during the Jaxsons Meeting.  Allen stated that he told the Kourys at the Jaxsons Meeting that BI had received several warnings from its banker that overdrafts that would take BI's checking account below -$25,000 would no longer be honored; that overdraft charges were costing the business enough to service a loan large enough to bring the business bank account current; and that SNB was not going to allow their personal banking account to have the large overdrafts it had tolerated in the past.  At trial, Omar testified that he was unaware that SNB permitted $25,000 in overdrafts.

16

At trial, Omar read a portion of his deposition into the record.  In his deposition, Omar said that he did not know what the cash flow of BI was at the time the loans were made.  Omar also said that Allen represented that paying the equipment loan off in addition to a loan from Omar would provide BI with sufficient working capital, and that Allen would have sufficient cash flow to easily handle the debt service of his business [Pl. Ex. 51].  Upon further questioning, Omar admitted that one purpose of the Turbo loan was to provide the business with working capital, but stated that the working capital was to be used to pay overdrafts, not salaries, and that Allen represented that he would use BI's income to pay salaries.  Omar testified that he believed BI would continue to do business and be able to provide debt service to cover the loan given to them by Turbo.

The Borschows' bank statements for the relevant time period (September 2006 through January 2007) reflect the following balances, deposits, and withdrawals:[5]

### Sept/Oct 2006

| ACCOUNTS | BEGINNING BALANCE | DEPOSITS | WITHDRAWALS | ENDING BALANCE |
|---|---|---|---|---|
| *****0206 9/6-10/5 (Pl. Ex. 17) | -11,229.61 | 0 | 33.00 | -11,262.61 |
| *****9549 9/21-10/20 (Pl. Ex. 24) | -11,404.75 | 10/2: 10k Total: 15k | 13,678.12 | -10,082.87 |
| *****0773 10/1-10/31 (Pl. Ex. 32) | -20,370.68 | Total: 41,407.83 | 37,506.09 | -16,468.94 |

### Oct/Nov 2006

| ACCOUNTS | BEGINNING BALANCE | DEPOSITS | WITHDRAWALS | ENDING BALANCE |
|---|---|---|---|---|
| *****0206 10/6-11/5 (Pl. Ex. 18) | -11,262.61 | 11/3: 18k Total: 18k | 4.00 | 6,733.39 |
| *****9549 10/21-11/20 (Pl. Ex. 25) | -10,082.87 | 11/3: 62k Total: 66,822.01 | 57,311.16 | -572.02 |
| *****0773 11/1-11/30 (Pl. Ex. 33) | MISSING | MISSING | MISSING | -2,153.90 |

### Nov/Dec 2006

| ACCOUNTS | BEGINNING BALANCE | DEPOSITS | WITHDRAWALS | ENDING BALANCE |
|---|---|---|---|---|
| *****0206 11/6-12/5 | 6,733.39 | 12/1: 10k Total: 11,149.22 | 15,390.00 | 2,492.61 |

---

[5] Deposits of checks from Omar or Turbo are listed individually and highlighted.

| (Pl. Ex. 19) | | | | |
|---|---|---|---|---|
| ******9549<br>11/21-12/20<br>(Pl. Ex. 26) | -572.02 | Total: 12,265.24 | 14,190.44 | -2,497.22 |
| ******0773<br>12/1-12/31<br>(Pl. Ex. 34) | -2,153.90 | 12/11: 27,608.46<br>Total: 66,516.66 | 60,628.26 | 3,734.50 |

### Dec 2006/Jan 2007

| ACCOUNTS | BEGINNING BALANCE | DEPOSITS | WITHDRAWALS | ENDING BALANCE |
|---|---|---|---|---|
| ******0206<br>12/6-1/5<br>(Pl. Ex. 20) | 2,492.61 | 12/08: 27,608.46<br>Total: 30,948.72 | 29,783.42 | 3,657.91 |
| ******9549<br>12/21-1/20<br>(Pl. Ex. 27) | -2,497.22 | Total: 11,160.48 | 14,549.14 | -5,885.88 |
| ******0773<br>1/1-1/31<br>(Pl. Ex. 35) | 3,794.50 | Total: 44,610.82 | 41,579.48 | 6,579.48 |

### Jan/Feb 2007

| ACCOUNTS | BEGINNING BALANCE | DEPOSITS | WITHDRAWALS | ENDING BALANCE |
|---|---|---|---|---|
| ******0206<br>1/06-02/05<br>(Pl. Ex. 21) | 3,657.91 | 1/18: 21,391.54<br>Total: 30,127.08 | 25,797.08 | 7,987.91 |
| ******9549<br>1/21-2/20<br>(Pl. Ex. 28) | -5,885.88 | Total: 18,339.81 | 15,510.10 | -3,056.17 |
| ******0773<br>2/01-02/28<br>(Pl. Ex. 36) | 6,579.48 | Total: 27,723.54 | 37,257.65 | -2,954.63 |

Account ******0206 is in the name of Allen and Patricia Borschow and called "Special Account" on the statements (the "Special Account"). Account ******9549 is also in the name of Allen and Patricia Borschow and has no special designation on the statements (the "Personal Account"). Account ******0773 is in the name of Borschow Industries INC DBA MB Industries (the "Business Account"). Some of the statements contain copies of checks written from the account, others do not. Checks attached to the October/November statement for the Personal Account indicate that the Borschows transferred $40,000 from that account to BI (through its d/b/a MB Industries) on November 6, 2006 (Pl. Ex. 25). The November statement from the Special Account includes a copy of a check from that account to BI (through its d/b/a MB Industries) in the amount of $9,000 (Pl. Ex. 19). The December statement from the Special Account

includes a copy of a check from that account to BI in the amount of approximately $27,608, suggesting that the Borschows deposited the December 8th Check into the "Special Account" and transferred the money to BI's account (Pl. Ex. 20, 34).

At trial, Omar testified that he wrote the first $10,000 check on September 30, 2006 because Allen represented that his account at SNB was overdrawn and that $10,000 would bring the account positive while he went through the process of securing a loan from Chase Bank.  When asked why some of the checks stated that they were "personal loans," Omar stated that in his experience if he were to obtain a loan under a business or a company and he was going to guarantee the loan, it made sense to make it a personal loan because it encompasses all of the assets as some sort of collateral for the loan.  Also in his proffer, Omar stated that he began loaning Allen money and expected to be paid back when Allen obtained the loan from Chase Bank.

According to Allen's proffer, the purpose of September 29th Check from Omar for $10,000 was to bring the business and personal account overdraft balances at SNB down.  Allen testified that in October 2006, he told Omar how much he believed BI would need as a business and how much his household budget would need to cover current expenses.  Allen also stated that in December of 2006, BI's sales had not rebounded and he told Omar of BI and the Borschows' ongoing cash flow needs.  Allen said that on December 1st and 8th, Omar issued him the $10,000 and $27,608 checks.  According to Allen, in early January he again informed Omar of his ongoing personal and business cash flow needs and they discussed an overall loan amount of $150,000.  Allen testified that he deposited the Turbo loan proceeds into their personal account because their other accounts had become overdrawn and SNB would immediately collect the overdrafts amounts against those loan proceeds if they had been deposited in overdrawn accounts.  If that had occurred, Allen said that they would have been unable to pay for critical expenses, including labor, utilities, rent, taxes, shipping, house and car payments, and food.

### 3.  Additional Eureka Representations

When discussing Eureka in his proffer, Ernest said that BI's business relationship

with Eureka influenced the decision to loan money to the Borschows because the Borschows stated they would pay Eureka in full with the loan proceeds.  Ernest said that the Borschows owed Eureka $21,391 when they represented that they would use the Turbo loan proceeds to pay Eureka in full.  Omar testified that Allen represented that the Borschows would pay Eureka in full once they obtained the loan proceeds; thus, "the $21,391.54 check paid to the Borschows on January 18, 2007, was initially withheld in order to be paid directly to Eureka by Turbo."  Instead, according to Omar, Allen requested that the money be paid to him, representing that this was necessary for accounting purposes.  Omar also said that Allen represented he would immediately write a check or use a credit card to pay Eureka directly. However, the Borschows never used it to pay off the Eureka balance.

At trial, Omar reiterated that he had originally withheld the $21,391 from the $50,000 loan because that was the amount owed to Eureka, but ultimately wrote Allen a check for that amount because Allen asked to pay Eureka personally for accounting purposes.  Omar further testified that Allen said he would pay Eureka immediately by credit card or check.  Omar said that, at the time, he had no reason to distrust Allen. Similarly, Ernest testified that Omar initially withheld $21,391 from the loan proceeds, but released the funds on January 18th because the Allen represented that he would use the money to immediately pay off Eureka.

Allen's own testimony regarding the Eureka debt is conflicting.  First in his proffer, Allen said that Omar did not make issuance of the last check that went into the $150,000 note contingent upon any firm promise pay the Eureka debt.  Instead, Allen testified that he told Omar he would try to pay the Eureka debt.  Then on cross-examination at trial, Allen admitted that Omar had made payment of Eureka a condition of the loan.  At trial, Allen also said that Patricia was not with him when he received the January 18th check from Omar.

Allen testified that the January 18th check was "swallowed up" immediately because they had a -$21,000 balance in their bank account and BI had no sales. According to Allen, in early February 2007, he met with the Kourys and explained that nearly all of the funds they had loaned to him had either been applied unilaterally by SNB to overdrafts or had to be used to pay operating expenses of BI and so there was

not much remaining to pay Eureka.  Allen stated that if he had not used the money for those purposes BI would have had to close its doors, leaving no way to earn anything to be applied to repayment of the note to Turbo.  Allen said that he paid $4,000 to Eureka in February 2007.

On cross-examination at trial, opposing counsel presented Ernest with an email from Omar to Allen dated October 24, 2007 attaching a statement from Eureka.  [Def. Ex. R].  The October 24th email states:

> Allen, attached is a copy of your Eureka Statement.  The first credit listed is for the $4,000 which was paid on 2/15/07, and the second credit is for $20,725.28 which was posted 10/24/07 (this is for the transfer of debt to Turbo Aleae as agreed to in the letter regarding new payment terms). These credits were posted to your open invoices and left a balance due to Eureka of $300.79.

At trial, Ernest said he could not verify the statement that the Borschows paid Eureka $4,000 on February 15, 2007 or that the second payment for $20,725.28 was made by Turbo, but stated that he was aware that the payments were made.

### 4. Life Insurance Representations

Discussing the alleged promise to obtain life insurance, Ernest stated at trial that obtaining life insurance was a term imposed to get the loan from Turbo and that Allen was supposed to get a life insurance policy listing Turbo as beneficiary.  Ernest also testified that he owned an interest in the life insurance company that Omar referred to Allen. He further testified that the insurance company offered a discount to Allen and that $500 would be deducted from the amount due on the loan in order to offset the costs of insurance.  On cross-examination, Ernest admitted that the loan agreement dated January 29, 2007 did not contain a clause requiring the note to be secured by a life insurance policy.  Ernest also admitted that Allen tried for months to get an insurance policy and that Allen thought the cost was out of line, even though the cost was going to be offset by the discount on the loan.

On cross examination, Allen agreed that he was supposed to get a life insurance policy naming Turbo as beneficiary, but that he did not believe this was requested at the time of the November 3, 2006 promissory note.  Allen stated in his proffer that he fully

intended to obtain a life insurance policy when Omar asked him to at the time the January 29, 2007 note was signed. Allen stated that he applied for the policy at the office of the life insurance agency Omar recommended. According to Allen, he kept asking for coverage and after several months they declined his application and offered him a "rated" policy. Allen said he found the cost of the rated policy to be excessive and unaffordable. Allen stated that he told Omar about the expensive "rated" policy and that he had declined it, and that from that point on Omar did not ask him to obtain a life insurance policy. On re-direct examination, Allen testified that Omar did not tell him that Turbo would defray the cost of the insurance premiums and if they had been defrayed, it would have made a difference in his decision to reject the rated life insurance policy.

### 5.  Homestead Lien Representations

In regard to the promised lien on the Borschows' homestead, Omar testified at trial that during the loan process there was a time that Allen failed to make a payment to Eureka and that he had a discussion with Allen about other collateral that could be used to secure the loan. Omar stated that during the discussion, Allen said he had $60,000 in equity in his home and was willing to use that as security for the loan. Omar testified that this conversation took place near the middle or end of the loan discussions. Opposing counsel directed Omar to a document entitled Real Estate Lien dated August 10, 2007 [Def. Ex. H]. Upon questioning, Omar stated that he thought the document would give him a valid lien on the Borschows' homestead because he was aware that lenders could get liens on property. Omar stated that when he presented the documents to Allen, Allen refused to sign them because he said the loan documents were invalid. When questioned about his reliance on the representation that the Borschows would give him a lien on their home, Omar said that the Borschows had verbally agreed to provide him with a lien on their home and based on that representation, Omar drafted lien documents to reflect that agreement. Omar said that when he presented Allen with the lien documents sometime later, Allen refused to sign them because Allen's attorney told him the lien documents were not valid.

Regarding the homestead lien, Allen said that Omar had his attorney prepare a deed of trust in favor of Turbo that purported to encumber the Borschows' homestead. Allen said that he had never agreed to the deed of trust and that when Omar presented it to him, he took it to an attorney and asked if it would be binding if against their home if signed.  Allen stated that he then told Omar that he and Patricia would not sign the document because it would not be enforceable against their homestead.  On re-direct examination at trial, Allen said that at the time, their home had a value of $185,000 and they had 2 or 3 mortgages totaling $150,000.  Allen also testified that at the time the home lien was discussed, all of the $150,000 had been loaned by Omar and Turbo.

### III.    LEGAL ANALYSIS

#### A. General Legal Standards-§523(a)(2)(A)

Under §523(a)(2)(A) of the Bankruptcy Code, an individual debtor is not entitled to a discharge from any debt "for money, property, services, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition". 11 U.S.C. §523(a)(2)(A).

According to the Fifth Circuit, the terms "false pretenses", "false representation" and "actual fraud" in §523(a)(2)(A) are "terms of art . . . [and] are common-law terms." *AT&T Universal Card Services v. Mercer*, 246 F.3d 391, 402 (5th Cir. 2001) citing *Field v. Mans*, 516 U.S. 59, 69 (1995).  Thus, §523(a)(2)(A) must be interpreted in accordance with the common law.  *Mercer*, 246 F.3d at 406.

A creditor must prove a debt is non-dischargeable by a preponderance of the evidence.  *Id.* at 403.  The preponderance of the evidence standard requires the finder of fact to believe it is "more probable than not that a fact exists in order to find for the party putting forth that fact."  *See Neo Ventures v. Hamann*, 2010 WL 2985887 (Bankr. W.D.Texas 2010), citing *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121 (1997).

Although earlier Fifth Circuit cases distinguish between "false pretenses", "false representations" and "actual fraud," a more recent Fifth Circuit case lists the same

elements for all three. *See General Electric Capital Corp. v. Acosta*, 406 F.3d 367, 372 (5th Cir. 2005) (listing elements under § 523(a)(2)(A) generally); *Mercer*, 246 F.3d at 403 ("Prior to *Field*, some courts defined differently § 523(a)(2)(A)'s three bases. Likewise our court has applied different, but somewhat overlapping, elements of proof for § 523(a)(2)(A) actual fraud, as opposed to false pretenses/representation. We are *not* required to address whether such distinctions survived *Field*"); *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995) (distinguishing false pretenses/representations from actual fraud). However, a recent Western District of Texas case continued to distinguish between false representation/false pretense and actual fraud. *See Jacobson v. Ormsby*, 2006 WL 2796672 (W.D.Tex. 2006) (unpublished) affirmed, 2007 WL 2141961 (5th Cir. 2007). Accordingly, this Court will consider Turbo's allegations of non-dischargeability under both false representation/false pretense and actual fraud tests.

In order for a debt to be deemed non-dischargeable due to "false pretenses" or "false representation," the creditor must show: (1) a knowing and fraudulent falsehood; (2) describing past or current facts; (3) that was relied upon by the other party. *Pentecost*, 44 F.3d at 1292. "A mere promise to be executed in the future is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach." *Jacobson*, 2006 WL 2796672, citing *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991). In other words, the "false representations and false pretenses [must] encompass statements that falsely purport to depict *current or past facts.* [A debtor's] promise . . . related to [a] *future action* [which does] not purport to depict current or past fact . . . therefore cannot be defined as a *false representation or a false pretense*." *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir. 1991), citing *In re Roeder*, 61 B.R. 179 (Bankr. W.D.Ky. 1986). However, a promise regarding a future action can still form the basis of a non-dischargeable debt under the "actual fraud" arm of § 523(a)(2)(A) if the debtor made "promises of future action which, *at the time they were made*, he had no intention of fulfilling." *Roeder*, 61

B.R. at 181. [6]

Silence can be a false representation under §523(a)(2)(A), if the debtor was under a "duty to speak." *Mercer*, 246 F.3d at 404, citing RESTATEMENT (SECOND) OF TORTS §551 (1977).  Restatement Second of Torts §551 provides:

> One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
> > (a) matters know to him that the other is entitled to know because of a fiduciary or other similar relation of trustee and confidence between them; and
> > (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
> > (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
> > (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
> > (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

According to the Fifth Circuit, for a debt to be non-dischargeable due to "actual fraud," a creditor must show by a preponderance of the evidence that: (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the representation was made with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result of its reliance.  *Acosta*, 406 F.3d at 372.

Whether or not the elements are identical for actual fraud, false pretenses and false representations, a creditor must prove that the debtor had an "intent to deceive" for the debt to be deemed non-dischargeable under § 523(a)(2)(A).  *Dorsey v. Dorsey*, 505 F.3d 395, 399 (5th Cir. 2007).  A Court may infer intent to deceive "'from reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation."  *Acosta*, 406 F.3d at 372, citing *In re Norris*, 70 F.3d

---

[6] In *Roeder*, a debtor's promise to turn over his tax refund in order to secure a loan "related to a future action, the assignment of the income tax return, [thus] his failure to carry out that promise [was] *not* a false representation or false pretense for purposes of §523(a)(2)(A)." 61 B.R. at 181.

27, 30 n. 12 (5th Cir. 1995).  However, "an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive."  *Acosta*, 406 F.3d at 372, citing *Palmacci v. Umpierrez*, 121 F.3d 781 (1st Cir. 1997).  "A representation of the maker's own intention to do . . . a particular thing is fraudulent if he does *not* have that intention."  *Mercer*, 246 F.3d at 408 citing RESTATEMENT (SECOND) OF TORTS §530(1) (1977).

Similarly, the creditor must show that it "justifiably relied" on the representation in order to demonstrate that a debt is non-dischargeable due to actual fraud, false pretenses, or false representations.  A person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation".  *Field v. Mans*, 516 U.S. 59, 70 (1995) citing RESTATEMENT (SECOND) OF TORTS §537 (1977).  According to the U.S. Supreme Court,

> Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man.  Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all cases…. [however] a person is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.  *Mans*, 516 U.S. at 70-71.

In applying these legal principles to the case at bar, the Court reaches the following conclusions.

### B. Is the Debt Non-dischargeable Based on False Representations or False Pretenses?

In this case, Turbo cannot recover under the false representation/false pretense arm of §523(a)(2)(A) because the allegedly false representations made by the Borschows-- promising to use the loan proceeds in a certain way in the future-- does not describe a past or current fact.  *See Bercier*, 934 F.2d at 692; *Jacobson*, 2006 WL 2796672; *Roeder*, 61 B.R. at 181(recognizing that a debtor's promise related to a future action is not a representation concerning a current or past fact, and therefore is not a

26

false representation or false pretense under §523(a)(2)(A)).

Further, Turbo listed the elements of actual fraud to describe its cause of action in the Complaint.  Thus, the Court will examine whether the Borschows' debt to Turbo is non-dischargeable due under the actual fraud arm of §523(a)(2)(A).

### C. Did Allen Borschow Commit Actual Fraud by Falsely Representing that He Would Use Loan Proceeds to Pay Off the SNB Loan?

The first ground for non-dischargeability in Turbo's Complaint is that the Borschows falsely represented that they would use loan proceeds from Turbo to pay off their debt at SNB so that Turbo would have a first lien on BI's equipment.  According to Benjamin Franklin, "creditors have better memories than debtors". However, in a dischargeability action under §523(a)(2)(A), the creditor bears the burden of demonstrating that its memory of the facts at issue are correct by a preponderance of the evidence.

Here, the Court is faced with two versions of the events surrounding the loans from Turbo to Allen.  On the one hand, we have a creditor swearing that the debtor promised to use the loan proceeds to pay off the SNB loan.  On the other hand, we have a debtor swearing that he made no such representation.  While the Court is sympathetic to Turbo and believes that Omar and Ernest likely thought Allen should have used the money to pay off the SNB loan, after weighing the evidence and testimony, the Court concludes that Turbo has failed to show that Allen obtained the loan proceeds through actual fraud by falsely representing he would use the loan proceeds to pay off the SNB loan.

Specifically, the Court finds that Turbo failed to show by a preponderance of the evidence  that (1) Turbo relied on Allen's statement that he would use the loan proceeds to pay off the SNB loan; (2) Allen represented that he would pay off the SNB loan; and (3)  Turbo was damaged to the extent of its claim by any such representation. Each of these are necessary requirements to find non-dischargeability based on actual fraud. *Acosta*, 406 F.3d at 372.

First, Turbo failed to show that it relied on any statement by Allen that he would use the loan proceeds to pay off SNB.  Predictably, the Court is faced with conflicting

testimony regarding the SNB representation, the Kourys say Allen made the representation, and Allen says he did not.  Thus, the Court is faced with a question of memories and credibility.  The Kourys testified that Allen represented he would use the loans from Turbo and Omar to pay off the SNB loan, and such representation was made at their very first meeting (the Jaxsons Meeting).  However, the testimony is consistent that at the Jaxsons Meeting, the Kourys suggested and the parties agreed that Allen would seek the loan he needed from Chase Bank.  The evidence also demonstrates that the parties held this belief until, at least, November 3, 2006, the date they signed the November 3rd Note because the note matured on January 5, 2007.  Omar's testimony supports that the intent of the parties on November 3rd was that the $90,000 promissory note between Turbo and Allen would be paid from the proceeds of the loan between Allen and Chase Bank.  Thus, there is no reason Turbo would rely on any statements Allen might have made about how he would use the loan proceeds to pay SNB at the time the loans were made because at that time Turbo expected to be paid from the Chase Bank loan proceeds.  Additionally, it confounds the Court why the Kourys--at the very first meeting with Allen (the Jaxsons Meeting)--would send Allen to Chase Bank for a loan to pay off the SNB loan *if* Allen had represented to the Kourys at this very first meeting that he would use the loan to be made by Omar and Turbo to pay off the SNB loan.  Although the Kourys' testimony indicates that paying off the SNB loans was discussed, perhaps even suggested, Allen's testimony indicates that he did not come away from the Jaxsons Meeting believing he had to use the money loaned by Omar and Turbo to pay off the SNB loan.

Further, when faced with negative bank account balances, it is unsurprising that Allen would use loan proceeds to pay his bills instead of to pay off the SNB loan and free the BI equipment from SNB's liens.  It is very understandable to the Court that the Kourys would be shocked and angry when they discovered that their loan proceeds were used largely to cover overdrafts and pay salaries and bills. Also, Omar stated at trial that he did not visit BI to even look at the equipment that was supposed to secure his loan, and did not know what the equipment was worth.  The Court finds it hard to believe that Omar, an experienced businessman, relied on a representation that he would have a first lien on equipment in making a loan when he had no idea about the

value of the equipment and took no action to try to obtain a lien.

Second, Turbo failed to show that Allen represented that he would use the loan proceeds to pay off SNB. No written evidence contemporaneous with the loan disbursement reflects that Allen made the representation. The loan documents contain no representation or information on the purposes of the loan. The loan checks were written to Allen individually, not to Allen and SNB. Further, many of the checks were labeled "personal loan", which is inconsistent with the notion that the funds would be used to pay off a corporate debt of BI to SNB. The only written evidence is an after-the-fact July 27th Email written by Omar six months after the last of the loan money was disbursed. Turbo argues that it is natural that Allen would dispute the allegations in such email if indeed they were incorrect; however, Turbo did not demonstrate that the Allen had a duty to refute the allegations in the email as the transaction at issue in the email occurred six months earlier. Thus, under the law governing silence as fraud, Allen had no duty to refute because the duty did not arise before the transaction commenced. Moreover, it is likely Allen did not want to further inflame his benefactor by arguing over Omar's interpretation of the use of the loan proceeds.

Although written evidence of a representation is not necessary for a finding of actual fraud under §523(a)(2)(A), it is hard to imagine that if the purposes of the $150,000 loan were so important to the Kourys that they relied on them in making the loan, that these experienced and sophisticated businessmen would not document those purposes in writing in some manner. Clearly, Allen was in a desperate situation, perhaps so desperate that he might say anything to obtain a loan; however, even if the Court could find that Allen made the representation (which the Court does not), the Court cannot find that Turbo and the Kourys justifiably relied on it.

In summary, the lack of clarity regarding the discussion at Jaxsons Meeting, the inherent inconsistency between the alleged misrepresentation by Allen at the Jaxsons Meeting that he would use the Turbo loan proceeds to pay off SNB and the uncontroverted testimony that at the Jaxsons Meeting the Kourys sent Allen to Chase Bank to get a loan to pay off SNB, and the lack of any contemporaneous documentation regarding the use of the loan from Omar and Turbo, prevents the Court from finding that Allen made a false representation and the Kourys relied on the alleged representation

that the loan proceeds would be used to pay off the SNB loan.

Finally, Turbo failed to show that it was damaged by the alleged misrepresentation that Allen would pay off SNB so it would have a first lien on BI"s equipment.  At trial, Omar testified that Turbo relied, not on BI's survival for repayment of Turbo's loan, but on the payment of the SNB loan because then BI's equipment would be free and clear and Turbo could be repaid from selling the equipment.  However, the only evidence showed that Turbo suffered only nominal damage due to the alleged representation (even if made) because the only evidence of value of the equipment was that it sold at auction for $1,640.  Therefore, any representation by Allen that he would grant Turbo a first lien in the business equipment only damaged Turbo in the amount of $1,640.  Additionally, although Turbo claims that the Borschows' failure to pay off the SNB loan meant that they did not have a security interest in BI's equipment, the Turbo loan did not specify any collateral as security.  At trial, Omar and Ernest held themselves out at experienced businessmen.  As experienced businessmen, it is not credible that they did not know how to properly secure a loan.  Indeed, the January 29th Note expressly states that there is no security for payment.

Accordingly, for any or all of these reasons, the Court finds that Allen did not commit actual fraud under §523(a)(2)(A) by falsely representing that he would use the loan proceeds to pay off the SNB loan.

### D. Did Allen Borschow Commit Actual Fraud by Falsely Representing that He Would Use Loan Proceeds to Only Cover Overdrafts in BI's Corporate Bank Account and Not for Salaries or Personal Expenses?

In addition to the grounds set forth in the Complaint, in its Motion for Summary Judgment and Pre-Trial Order, Turbo asserted that the Borschows falsely represented that they would use the loan proceeds to bring their corporate (BI) bank account current and not for salaries and personal expenses. [7]  The Court finds that Turbo failed to establish that (1) Allen made such representation; (2) Allen intended to deceive Turbo; and (3) Turbo justifiably relied on the representation.  Each are necessary requirements

---

[7] Although the Court is unsure whether this ground was properly pled as it was not asserted in the Original Complaint, the Court will address it to the extent it was tried by the consent of the parties.

for a finding of non-dischargeability based on actual fraud.  *Acosta*, 406 F.3d at 372.

First, the evidence fails to demonstrate the Allen made any false representations. Between October 1, 2006 and February 1, 2007, at least $76,608 of the money loaned by Omar and/or Turbo went to BI and during that time period BI's account went from -$16,468 to $6,579 in January of 2007, to -2,954 in February 2007.  Thus, at least a portion of the loan proceeds were used to bring BI's account current; however, it appears that BI was unable to maintain a current balance even with the influx of money from Turbo.

Predictably, the Court has conflicting evidence on whether Allen represented that he would use the loan proceeds solely to cover overdrafts in BI's business account and not for salaries and personal expenses.  At trial Omar asserted that BI could use the loan proceeds, but that salaries were to be paid from BI's business income.  Allen asserted that he could use the loan proceeds to bring his personal accounts current. Again, the Court is faced with a question of memories and credibility.  The Court finds Allen's account of the events more credible in part because both Omar and Ernest stated in their proffers that at the Jaxsons Meeting, Allen represented he needed money to bring "his bank accounts current"—not just his business bank account current.  *See* Omar Proffer pg. 3; Ernest Proffer pg. 2.  Additionally, several of the loan checks are designated "personal loan" and the checks were made payable to Allen individually, not to Borschow Industries (BI).  Given this evidence, the Court cannot find that Allen represented that he would use the loan proceeds solely to bring BI's bank account current.

Second, there is insufficient evidence that Allen intended to deceive Turbo into believing that he would use the money to bring only BI's business account positive.  The testimony demonstrates that Omar understood that the loan proceeds would be used to pay overdrafts and to give the Borschows needed working capital.  The dispute appears to reflect a disagreement on the meaning of "working capital."  Allen believed "working capital" to include salaries for him and his wife, while Omar did not.  The Court has no evidence suggesting that the parties discussed the meaning of "working capital" at the time the loan proceeds were disbursed and therefore cannot find that Allen intended to deceive Omar into making the loans under the belief that the Borschows would draw

their salaries from BI's income. It appears to the Court that the Kourys and Borschows attributed a different meaning to the phrase "working capital" and the result is a misunderstanding, not a misrepresentation.

Finally, there is insufficient evidence that Turbo justifiably relied on the representation that Allen would use the loan proceeds to bring only his business account current. Omar testified that when he began loaning Allen money he expected to be paid back when Allen obtained the loan from Chase Bank. It is unclear why Omar would rely on the representation that Allen would use the money to bring his business account current, if Omar expected to be repaid from the money Allen obtained from the Chase Bank loan. Additionally, if Turbo relied on the representation that the loan proceeds would be used solely to bring the BI account positive and for BI working capital, Omar should have written the check to BI, not Allen.

Although Omar is understandably furious that the Borschows did not pay back the money Turbo loaned to them and used the money to pay personal expenses, the evidence and testimony at trial does not demonstrate that the Borschows defrauded or misrepresented that they would use the proceeds solely for only BI's business expenses and overdrafts.

Accordingly, the Court concludes for any or all of these reasons, that Allen did not commit actual fraud under §523(a)(2)(A) by falsely representing that he would use the loan proceeds to only cover overdrafts in BI's corporate bank account and not for salaries and personal expenses.

### E. Did Allen Borschow Commit Actual Fraud by Falsely Representing that He Would Use Loan Proceeds to Pay Off the Eureka Debt?

The second ground in the Turbo's Complaint is that the Borschows falsely represented that they would use the loan proceeds from Turbo to pay off their Eureka debt. On this ground, the Court finds that Turbo successfully established by a preponderance of the evidence that (1) Allen represented he would pay the Eureka debt; (2) at the time he made the representation he knew he would not pay the Eureka debt; (3) he made the statements intending to deceive Omar so Turbo would give him the money; (4) Omar justifiably relied on Allen's representation; and (5) Turbo was

damaged because Allen did not use the money to pay off his Eureka debt.

First, the undisputed testimony is that Omar intended to withhold $21,391 of the $50,000 working capital loan Allen asked for in December 2006 in order to pay the Eureka debt.  It is also undisputed that Allen then asked Omar to give him the $21,391 so he could pay Eureka directly for accounting purposes—and that Allen did not use the money to pay Eureka.  Instead, Allen deposited the money in the Special Account. Under these circumstances, the Court finds very credible the Kourys' testimony that they relied on Allen's representation that he would use the money to immediately pay Eureka because Omar clearly intended to hold back the money to pay Eureka directly and it is unlikely he would be willing part with the money without the representation that Allen would pay Eureka with the money.  For these reasons, the Court does not find credible Allen's testimony that he told Omar he would pay off the Eureka debt only if he could.  The Court's finding is further bolstered by Allen's admission at trial that after the July 27th meeting, he apologized to the Kourys for not paying the Eureka debt.

Second, the false representation that Allen would immediately pay off the Eureka debt damaged Turbo.  Instead of having the Eureka debt paid off, Turbo eventually rolled the Eureka debt into the September 28th Note and paid Eureka itself.  However, the evidence and testimony also demonstrates that Allen made a $4,000 payment to Eureka on February 27, 2007, so Turbo was only damaged by the false representation in the amount of $17,391.54.

Accordingly, the Court concludes that Allen did commit actual fraud under §523(a)(2)(A) by falsely representing that he would use a part of the loan proceeds to pay Eureka. Thus, the Court finds that $17,391.54 of the debt owing by Allen to Turbo is non-dischargeable.

### F. Did Allen Borschow Commit Actual Fraud by Falsely Representing that He Would Obtain a Life Insurance Policy?

The third ground in the Turbo's Complaint is that the Borschows falsely represented that they would secure a life insurance policy naming Turbo as beneficiary. Although Allen admits that Omar asked him to obtain a life insurance policy naming Turbo as the beneficiary, it is entirely unclear to the Court if Omar asked for the life

insurance policy before, or after, lending Allen the money. The timing is important because if the representation occurred after the last of the loan was disbursed, Omar could not have relied on the representation when he gave Allen the money.

At trial, Ernest testified that obtaining life insurance was a term imposed to get the loan from Turbo, suggesting that the insurance policy requirement was not discussed until the parties decided that Turbo would loan Allen the money instead of Chase Bank—after the November 3rd promissory note was signed and $90,000 of the money had been disbursed to Allen. Allen's testimony that he did not believe the insurance policy was requested at the time of the November 3, 2006 promissory note supports Ernest's testimony that the insurance policy was a requirement discussed after the parties decided to abandon the idea of Allen obtaining a loan from Chase Bank. Therefore, the Court finds that Turbo could not have relied on Allen's representation that he would obtain life insurance when it loaned him the first $90,000. The Court also finds that Turbo failed to meet its burden to show that it relied on Allen's statement when it disbursed the remainder of the funds because the Court has no reliable evidence on when Omar asked Allen to obtain the life insurance policy.

More importantly, the Court determines that Allen did not intend to deceive Turbo and the Kourys regarding the representation that he would obtain a life insurance policy. Allen stated in his proffer that he fully intended to obtain a life insurance policy when Omar asked him to at the time the January 29, 2007 note was signed. In fact, as evidenced by the letter from MetLife to Allen, Allen applied for the insurance coverage. Although Allen did not obtain the life insurance, the Court finds Allen's statement that he intended to get coverage credible; thus Turbo failed to show that Allen intended to deceive as required for a finding of fraud under §523(a)(2)(A).

Finally, the Court finds that Turbo did not sustain damage from any misrepresentation related to a representation to obtain life insurance because Allen is, obviously, still alive.

Accordingly, for any or all of these reasons, the Court concludes that Allen did not commit actual fraud under §523(a)(2)(A) by falsely representing that he would obtain a life insurance policy naming Turbo as a beneficiary.

### G. Did Allen Borschow Commit Actual Fraud by Falsely Representing that He Would Give Turbo a Mortgage on His Homestead?

In addition to the grounds set forth in the Complaint, in its Motion for Summary Judgment, Turbo asserted that the Borschows falsely represented that they would grant Turbo a lien on their homestead. [8]

However, there is insufficient evidence that the Borschows agreed to grant Turbo a mortgage on their homestead before the money had been loaned to the Borschows; thus, Turbo failed to show that it relied upon obtaining a lien on the Borschows' homestead when it granted the loan.

More importantly, Turbo did not sustain damage from any misrepresentation that the Borschows would grant Turbo a lien on their homestead, because any such lien would be invalid under Texas law.  Tex. Const. art. XVI, § 50.

Accordingly, for any or all of these reasons, the Court concludes that Allen did not commit actual fraud under §523(a)(2)(A) by falsely representing that he would grant Turbo a lien on his homestead.

### H. Did Patricia Borschow Commit Actual Fraud Under §523(a)(2)(A)?

There is insufficient evidence that Patricia Borschow made any of the allegedly affirmative false representations set forth in Turbo's Complaint or that Turbo relied on anything said or done by Patricia when making the loans to Allen.  It is undisputed that Patricia did not attend the Jaxsons Meeting and that she was not present and did not sign the November 3rd and January 29th promissory notes.  The Court finds credible Patricia's testimony that she never requested a loan from the Kourys or Turbo and did not make any representations as to the use of the loan proceeds.  Additionally, Patricia's testimony in this respect was not refuted by Turbo.

Instead, Turbo apparently relies on Patricia's "failure" to inform Turbo that its loan proceeds were not used to pay off SNB and her "failure" to refute the allegations in the

---

[8] The Court is unclear on whether or not Turbo continues to assert that its debt is non-dischargeable on this ground as its Pre-Trial Order does not discuss this issue.  However, the Court will address this ground to the extent this matter was tried by consent of the parties.

July 27th Email sent to her email address, as evidence that she made the representations alleged in the email. The Court is not persuaded by this evidence. Patricia was under no duty to inform Turbo or the Kourys that the SNB loans had not been paid because she was not a party to the business transaction at the time the money was loaned to Allen. *See Mercer*, 246 F.3d at 404; RESTATEMENT (SECOND) OF TORTS §551 (1977). Additionally, there is insufficient evidence suggesting that Patricia knew of any representations her husband may have made to the Kourys.

Accordingly, for any or all of these reasons, the Court concludes that Patricia Borschow did not commit actual fraud under §523(a)(2)(A), and thus Patricia's debt to Turbo is dischargeable in its entirety.

## I. Should Pre-judgment Interest, Post-judgment Interest, and Attorneys Fees be Awarded?

In its Complaint, Turbo asks the Court to award pre-judgment and post-judgment interest on the debt owed by the Borschows. As set forth above, the Court has found that $17,391.54 of the debt owed by Allen to Turbo is non-dischargeable.

According to the Fifth Circuit, "[t]he determination of whether pre-judgment interest should be awarded requires a two-step analysis: does the federal act creating the cause of action preclude an award of pre-judgment interest, and if not, does an award of pre-judgment interest further the congressional policies of the federal act." *Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dept. Stores, Inc.*, 15 F.3d 1275, 1288 (5th Cir. 1994). Once a court determines that pre-judgment interest can be awarded, whether or not to award such interest is in the court's discretion. *Id.*

Generally, "where a cause of action arises out of a federal statute, federal law governs . . . whether pre-judgment interest is to be allowed and at what rate." *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984-85 (5th Cir. 1991). Ultimately, whether or not a party is entitled to pre-judgment interest is in the discretion of the court. *Williams v. Trader Pub. Co.*, 218 F.3d 481, 488 (5th Cir. 2000) ("A district court has discretion to impose a pre and post-judgment interest award to make a plaintiff whole"); *Hansen*, 940 F.2d at 984-85 (affirming district court's award of 10% pre-judgment interest because state law is not binding but merely provides guidance and it is within the discretion of

the district court to award equitable pre-judgment interest.)  Also, where no federal statute governing pre-judgment interest exists, courts should look to state law for guidance on what pre-judgment interest rate is appropriate.  *Id; In re Advanced Modular Power Systems*, *Inc.*, 413 B.R. 643 (Bankr.S.D.Tex. 2009).

Here, §523(a)(2) of the Bankruptcy Code does not preclude an award of pre-judgment interest, and awarding such interest in this case furthers the congressional policy in enacting this section.  The intent of §523(a)(2) is to prevent a debtor from discharging a loan obtained by fraud.  Other bankruptcy courts have awarded pre-judgment interest on loans that are determined to be non-dischargeable under the Bankruptcy Code.  *See e.g., In re Harwood*, 404 B.R. 366 (Bankr.E.D.Tex. 2009).

In our case, Turbo rolled the money intended to pay off the Eureka debt into a loan represented by a promissory note that carried a 10.25% interest rate; thus applying pre-judgment interest to such loan furthers the congressional policies of the federal Bankruptcy Code.  Therefore, whether or not pre-judgment interest is appropriate lies within this Court's discretion. The Court finds that setting pre-judgment interest based upon the contractual interest rate in the January 29th and September 28th notes, (10.25%) is appropriate and necessary to make Turbo whole.  The Court also finds that the pre-judgment interest should accrue as of January 29, 2007, because the January 29th Note included the loan proceeds intended to pay off the Eureka debt and Allen should have been paying 10.25% on that loan from January 29, 2007.  However, the Court finds that the 10.25% interest rate should only apply to the $17,391.54 which is the non-dischargeable amount, as Allen subsequently paid $4,000 of the $21,391 owed to Eureka shortly after obtaining the loan.  Therefore, Turbo is entitled to recover pre-judgment interest from January 29, 2007 to April 8, 2011 at an interest rate of 10.25% on $17,391.54, which is the amount of $7,576.19.

Under 28 U.S.C. §1961(a), a Court may award post-judgment interest on any money judgment in a civil case recovered in district court.  As non-dischargeability actions arise under federal law, post-judgment interest accrues at the rate set forth in 28 U.S.C. §1961(a).  Thus, the Court finds that Turbo is entitled to post-judgment interest at a rate of 0.30%.[9]

---

[9] *See* www.federalreserve.gov/releases/h15/data.htm

The Court also determines that each party shall bear their own attorneys fees and expenses. Specifically, the Court finds that the loan at issue is not primarily consumer debt, and that the positions of parties in this proceeding were substantially justified. Thus, awarding attorney fees is not appropriate in this case. *See* 11 U.S.C. §523(d).

## IV.   <u>CONCLUSION</u>

In conclusion, the Court holds that the debt owing by Defendant Allen Borschow to Plaintiff Turbo Aleae Investments, Inc. is dischargeable, with the exception of $17,391.54 plus $7,576.19 in pre-judgment interest which is non-dischargeable due to actual fraud by Allen Borschow. The Court further concludes that any debt owing by Defendant Patricia Borschow to Plaintiff Turbo Aleae Investments, Inc. is dischargeable.

A Final Judgment will be entered contemporaneously herewith that incorporates this Memorandum Opinion.